(874 P.2d 695)
No. 70,161

· ROSCOE DICKISON, *Appellee*, v. SANDRA DICKISON, *Appellant*.

Opinion filed May 27, 1994.

*Dwight D. Sutherland, Jr.,* of Watson, Ess, Marshall & Enggas, of Olathe, for appellant.

*Gregory N. Pottorff,* of Turner and Boisseau, Chartered, of Overland Park, for appellee.

Before BRAZIL, P.J., RULON and LEWIS, JJ.

RULON, J.: Sandra Dickison appeals from a district court order awarding sole custody of her 12-year-old son to the boy's father, Roscoe Dickison. Sandra claims the court abused its discretion in changing custody *sua sponte* after the court had specifically found that Roscoe failed to prove a material change in circumstances. Furthermore, Sandra argues that the court's finding that awarding custody to Roscoe was in the best interests of the child was not supported by evidence in the record. We affirm.

The tragic facts of this case are as follows:

Sandra resides in Topeka and is employed as a dietician by the State of Kansas. Roscoe resides in Overland Park and teaches high school science and gifted education in the Kansas City, Missouri, school district. Sandra and Roscoe are the parents of one child, M.B.D., who was a sixth grader at a Topeka middle school at the time of the custody hearing.

Sandra and Roscoe were divorced in December 1980, shortly before the birth of their son, and, as provided in their settlement agreement, Sandra was given custody of M.B.D. When M.B.D. was less than a year old, Roscoe moved back in and lived with Sandra and M.B.D. until 1986.

A fierce legal battle for visitation and custody rights began after Roscoe moved out in 1986. In 1987, Mr. Jean Owen was appointed guardian ad litem for M.B.D. Further in 1987, M.B.D. was declared to be a child in need of care and placed in the temporary custody of SRS so that he could receive treatment for severe mental and emotional problems. M.B.D.'s psychiatric treatment involved residential stays at both Crittenton and Marillac Center for Children. A report from Crittenton indicated that M.B.D. was being adversely affected by his parents' custody battle and that if he was not protected from the legal and emotional turmoil, he would likely develop a severe character disorder. Unfortunately, over the next several years the legal battle for custody of M.B.D. only escalated.

In 1992, Roscoe filed his fourth motion for a change of custody, alleging that Sandra was failing to provide M.B.D. with proper food, clothing, and supervision. The merits of the motion were considered at a two-day hearing.

Testimony at the hearing indicated that M.B.D. is a very disturbed young man. He has experienced behavioral problems since he was first enrolled in preschool and has spent several years in a special behavior-disordered classroom. M.B.D. is prone to sudden, violent tantrums and has difficulty getting along with other students. He has been suspended from school on numerous occasions for pinching, hitting, profanity, obscene gestures, unexcused absences, and urinating on other students. Recently, Sandra removed him from the behavior-disordered program and placed him in a regular sixth grade class, where he has had difficulty maintaining good grades, making friends, and observing school rules. A social worker from the Topeka school district observed that M.B.D.'s worst behavior always coincides with custody hearings.

M.B.D. has repeatedly expressed the desire to live with Roscoe. M.B.D. often makes derogatory comments about Sandra and refers to her only as "it." At home, M.B.D. will not help with household chores or obey Sandra's rules. When M.B.D. is visiting Roscoe, he refuses to speak to Sandra on the telephone. Furthermore, M.B.D. continues to lodge accusations of physical and sexual abuse against Sandra.

There was evidence introduced at trial indicating that M.B.D.'s negative feelings toward Sandra have been instigated and encouraged by Roscoe. On one occasion, M.B.D. told the school social worker that "[m]y daddy says my mommy is not nice." Sandra testified that Roscoe has never respected the bond between her and her son. Roscoe testified that he does respect the mother-son relationship, and he supported this claim by telling the court how he tells M.B.D. to "forgive" Sandra for doing such a bad job of caring for him. Roscoe further said that he apologizes to M.B.D. for Sandra by saying, "I'm sorry she's your mother . . . ." Roscoe said that Sandra's name is never mentioned at his house, and, if M.B.D. brings up his mother, he is told that she will not be discussed. When M.B.D. arrives at Roscoe's home for a visit, he is required to take a bath and change into his "Overland Park clothes" before he can do anything else.

Roscoe testified that M.B.D.'s psychological problems stem from M.B.D.'s "giftedness." According to Roscoe, gifted children do not fit in with other classmates because they are "way above the normal and can't bring [themselves] back down to the normal." As a teacher of gifted students and a board member of S.M.A.G. (Shawnee-Mission Association of the Gifted), Roscoe stated that he was better equipped to deal with M.B.D.'s special needs.

At the time of the hearing, Roscoe was married to Nedra Dickison, who has raised two children of her own. Since that time, however, Nedra died. During the hearing, Nedra testified that M.B.D. is well-behaved and obedient when he visits Roscoe. Nedra further testified that M.B.D. likes eating home-cooked meals at the dining room table with placemats, linen, silver, crystal, and fine china. Nedra complained that Sandra had not taught M.B.D. proper table manners.

In his motion and at the hearing, Roscoe accused Sandra of neglecting M.B.D.'s needs. Roscoe claimed that his son often came to his house in dirty clothes. He further said that M.B.D. occasionally had to cook his own dinner or was forced to eat "fast food." Roscoe accused Sandra of leaving M.B.D. unattended at the Topeka library for long periods of time. Finally, Roscoe blamed Sandra for taking M.B.D. to the Topeka Boys' Club where M.B.D. supposedly learned obscenity and vulgarity.

Sandra denied all of Roscoe's claims. Sandra testified that it is very important to her that M.B.D. "have a concept of what the real world is like." Sandra further testified that she thought M.B.D. was making progress in learning to control his tantrums and in getting along with others. Sandra told the court that she had been in ill health and was just recovering from surgery.

M.B.D.'s guardian ad litem, Jean Owen, actively participated in the hearing, both in questioning witnesses and in offering his own opinion. Owen stated that, in his opinion, it would be detrimental for M.B.D. to reside with Roscoe because Roscoe was unable to emotionally detach himself from M.B.D. so as to provide a good environment for him. Owen described some of the extensive psychological counseling M.B.D. has received over the last several years and said he believed the boy's behavior problems stemmed from a combination of his giftedness and his parents' legal battles.

Owen informed the court that M.B.D. was actually in the custody of SRS at the time of the hearing.

During the hearing, the district court met with M.B.D. and talked to him for over an hour in chambers. No attorneys or other parties were present during this meeting, and no record was made of the conversation.

In ruling on the motion to change custody, the district court told Roscoe that he was dysfunctional, overbearing, and overreacting. The court said Roscoe's behavior had "forever scarred" his son. The court further stated that it did not believe any of the allegations in Roscoe's motion against Sandra and said, "Now, having made a finding that there is no material change of circumstance, the petitioner's motion for change of custody in this case is summarily denied." Furthermore, the court found that Roscoe's petition was frivolous in nature and granted Sandra's request for attorney fees.

After denying Roscoe's motion for a change of custody, the district court then awarded sole custody of M.B.D. to Roscoe *sua sponte*. The court said that if M.B.D.'s situation did not change, he would very soon end up "totally out of control and violent." The court further said it was awarding custody to Roscoe because the court believed it was the only way M.B.D. could

survive emotionally and also because the court wanted to protect Sandra from M.B.D.

In support of this decision, the district court said that Roscoe did have some good qualities he could share with M.B.D., such as a stable home environment, and that there were resources in the greater Kansas City area that could be of benefit to M.B.D.

The district court ordered Roscoe to obtain psychiatric care and requested the court be furnished a report from the psychiatrist every 60 days. The court further directed that M.B.D. be immediately returned to the behavioral disorder group at school and that M.B.D. continue to receive psychiatric care when he moved to Overland Park.

The district court terminated SRS's custody, saying "I have not heard any evidence whatsoever that SRS has done anything for you or continues to give you any benefits whatsoever." The court further dismissed Jean Owen, M.B.D.'s guardian ad litem, from further representation in the case. The court said Owen's further representation as guardian ad litem was terminated

"[p]rimarily because I believe to leave him as a pending guardian ad litem in this case is a message, a clear message, to all of you saying we have further litigation to do. And the main thing that I've tried to do in entering an order today, besides take care of [M.B.D.'s] interests, is to put you in a posture to end the stupidity in this further litigation."

Sandra filed a motion to alter or amend the district court's judgment, and a hearing was held to consider the matter. At the hearing, Sandra argued that there were not sufficient facts in the record to support the court's conclusion that it was in M.B.D.'s best interests to live with Roscoe. Furthermore, Sandra argued that awarding custody of M.B.D. to Roscoe would reward Roscoe for waging a ceaseless war against her. Owen appeared on behalf of M.B.D. and argued strongly that the court should terminate Roscoe's parental rights.

Ultimately, the district court reaffirmed the award of custody to Roscoe and explained the rationale for the court's decision. The court said that it found a material change in circumstances in this case in that M.B.D. had aged and become "an absolute obvious threat to the safety and welfare of his mother." The court said it based this conclusion upon the court's conversation with M.B.D., the school reports, M.B.D.'s behavior and body lan-

guage, and the body language of his mother. The court said that Roscoe and M.B.D. had formed a conspiracy "to get back· at mom" that would only intensify with further litigation. The court further concluded that· the only way that M.B.D. would have "half a chance" was to award custody to Roscoe and to ensure that Roscoe received psychiatric care.

It is well established that the paramount concern of the district court in a child custody case is the welfare of the child. *In re Marriage of Talkington*, 13 Kan. App. 2d 89, 93, 762 P.2d 843 (1988). The modification of a child custody order rests in the sound discretion of the district court, and its judgment will not be disturbed unless the record clearly shows such discretion to have been abused. 13 Kan. App. 2d at 93.

Abuse of discretion in child custody' proceedings has been defined as follows:

" 'Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court. If reasonable [persons] could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. All judicial discretion may thus be considered as exercisable only within the bounds of reason and justice in the broader sense, and only to be abused when it plainly overpasses those bounds.' " *Simmons v. Simmons*, 223 Kan. 639, 643, 576 P.2d 589 (1978).

The district court clearly found that Roscoe did not prove a change in material circumstances as alleged in his motion. In other words, Roscoe did not prove that M.B.D. was being neglected by Sandra. The court did, however, order a change in custody *sua sponte*. Sandra argues that the court erred in changing custody *sua sponte* because the court had specifically found that no change of circumstances had occurred.

K.S.A. 1993 Supp. 60-1610(a)(1) states that in a decree of divorce, "[t]he court shall make provisions for the support and education of the minor children. The court may modify or change any prior order when a material change in circumstances is shown, irrespective of the present domicile of the child or the parents."

Cases have consistently interpreted this statute as requiring a court to find some material change in the parties' circumstances before a custody order can be changed. *Patton v. Patton*, 215

Kan. 377, 378, 524 P.2d 709 (1974). "[A] decree awarding child custody is *res judicata* with respect to the facts existing at the time of the decree," and the burden of proving that circumstances have changed is upon the movant. *Simmons*, 223 Kan. at 642.

Sandra correctly argues that in announcing its original decision, the district court did not specifically find a change of circumstances. However, a close reading of the court's entire decision reveals that the court did consistently refer to several aspects of the case as being new developments. The court said that M.B.D. had grown older and that his behavior was becoming more violent. The court further stated the strong desire of M.B.D. to live with Roscoe as well as M.B.D.'s clear resentment of Sandra. The court considered the fact that Roscoe had remarried and maintained a stable household. Although the court did not use the words "change of circumstances," the court's recitation of the facts indicated that such a change was exactly what the court was considering.

Furthermore, during the hearing on the motion to alter or amend, the district court corrected the trial record and carefully explained that a change of circumstances had occurred. Such a correction is permissible because the purpose of a motion to alter or amend is to allow the trial judge the opportunity to correct prior errors. *Denno v. Denno*, 12 Kan. App. 2d 499, Syl. ¶ 4, 749 P.2d 46 (1988).

We conclude the district court did not abuse its discretion in ordering a change in custody even though it did not specifically find a change of circumstances at the conclusion of the custody hearing. Such a change of circumstances was implicit in the court's original decision and was clearly stated during the motion to alter or amend hearing.

Sandra further argues that the district court failed to consider the fact that Roscoe had blatantly refused to respect the bond between Sandra and M.B.D. and had, in fact, done everything in his power to destroy that relationship. Sandra contends that awarding custody to Roscoe under these circumstances clearly violates the legislative intent behind K.S.A. 1993 Supp. 60-1610(a)(3)(B)(vi).

K.S.A. 1993 Supp. 60-1610(a)(3)(B) sets forth a list of factors to be considered in determining custody of a child:

"(i) The length of time that the child has been under the actual care and control of any person other than a parent and the circumstances relating thereto;

(ii) the desires of the child's parents as to custody or residency;

(iii) the desires of the child as to the child's custody or residency;

(iv) the interaction and interrelationship of the child with parents, siblings and any other person who may significantly affect the child's best interests;

(v) the child's adjustment to the child's home, school and community;

(vi) the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent and to allow for a continuing relationship between the child and the other parent; and

(vii) evidence of spousal abuse."

The statute does not state that this is an exclusive list, nor does such statute indicate that any one factor is of more importance than any other.

A close reading of the record indicates that the district court considered all of the applicable 1610(a)(3)(B) factors in reaching its decision. Unquestionably, some of the evidence weighs heavily against Roscoe. However, balanced against such evidence was the desire of M.B.D. to reside with his father, the negative interaction of M.B.D. with his mother, and M.B.D.'s poor adjustment to school in Topeka. Because all of the factors are to be considered, we conclude that the district court did not abuse its discretion when finding that, overall, the child custody factors were in Roscoe's favor.

Next, Sandra argues that given the district court's findings concerning Roscoe's parental abilities, there was no basis in fact from which the court could have reasonably concluded that M.B.D.'s best interests were served by awarding custody to Roscoe. Sandra contends that because there was no factual basis for the court's ruling, the award of custody to Roscoe was an abuse of discretion.

The most critical consideration in a child custody case is what outcome best serves the interests and welfare of the child. *Simmons*, 223 Kan. at 642. "All other issues are subordinate thereto." 223 Kan. at 642. The court must determine which parent will do a better job of rearing the child and provide a better home environment. 223 Kan. at 642.

"The interest of an appellate court is directed only to such evidence as supports the findings of the trial court, and not to that which might tend

to establish contrary findings or a different result. An appellate court must accept the evidence which is most favorable to the prevailing party and where there is substantial competent evidence in the record to sustain a judgment—this court must sustain it rather than speculate as to what other dispositions the record might support." *Schreiner v. Schreiner,* 217 Kan. 337, 340-41, 537 P.2d 165 (1975).

The district court made numerous unflattering remarks concerning Roscoe's character and his behavior in this custody dispute. However, according to our standard of review, we must consider only those findings of the district court which support an award of custody to Roscoe.

The district court stated that Roscoe had some good qualities to share with his son, which included a stable home environment where M.B.D. could enjoy the resources of the greater Kansas City area. Moreover, the court stated that despite everything else, Roscoe had the best intentions for M.B.D.

The district court further considered the fact that during the time of Sandra's custody, M.B.D. was continuing to have behavioral problems in school and exhibit poor socialization. As we understand, the court believed from Sandra's demeanor and recent ill health that Sandra would not be able to control M.B.D. much longer. The court concluded that the only way M.B.D.'s behavior might improve is to put M.B.D. in a situation where Roscoe was no longer a disruptive hero-figure, but instead a real human being M.B.D. had to live with every day.

The district court's finding that M.B.D. was a threat to Sandra's health and welfare also supports the court's custody determination. While Sandra's safety is arguably a collateral issue that must be considered subordinate to the best interests of M.B.D., it certainly would not be in M.B.D.'s best interests to harm Sandra. The legal and emotional repercussions of such an act would follow M.B.D. for the rest of his life. The court placed M.B.D. in a custody situation where an uncontrolled confrontation with his mother is less likely to occur.

Finally, the district court considered the court's private conversation with M.B.D. and concluded that based upon M.B.D.'s statements and body language, he would be better off with Roscoe. Although there was no record made of the court's conversation with M.B.D., there was certainly a great deal of testimony

from other witnesses to corroborate the fact that M.B.D. wanted to live with his father.

For all of the above reasons, this court concludes that the district court found a substantial basis in fact to support the court's custody determination.

Even though we conclude the district court did not abuse its discretion in awarding sole custody of M.B.D. to Roscoe, there are at least two rulings of the court we find extremely troublesome. First, we believe the best interests of M.B.D. would have been better served if the guardian ad litem's representation had not been terminated by the district court before this appeal was perfected. This court (as well as any court) needs and welcomes counsel's sound wisdom in deciding important issues. We agree with the court that a guardian ad litem was needed for proper representation of M.B.D. at the district court proceedings. Our concern is that such representation ended at the conclusion of the district court proceedings.

Second, and equally troublesome to this court, is the failure of the district court to make a record of the conversation, in chambers, between the court and M.B.D. in the absence of counsel and parties. Unquestionably, Sandra did not object to this procedure. However, this court could have greatly benefited from having the opportunity to review, in camera, a transcript of such conversation.

We firmly conclude the better practice is for district courts to make a record of ex parte conversations between the court and minor children during contested custody disputes. Such transcripts, if needed, can be ordered sealed by the court except for in camera proceedings. Although the failure of the district court to make such a record here is not considered by this court to constitute reversible error under the specific facts of this case, such failure in the future may constitute reversible error.

Affirmed.